OIL, CHEMICAL & ATOMIC WORKERS INTERNATIONAL
UNION, LOCAL UNION NO. 3–689, et al., Appellants,

v.

MARTIN MARIETTA ENERGY SYSTEMS, INC., Appellee.

[Cite as *Oil, Chem. & Atomic Workers Internatl. Union v. Martin
Marietta Energy Sys., Inc.* (1994), 97 Ohio App.3d 364.]

Court of Appeals of Ohio,
Pike County.

No. 93 CA 523.

Decided Sept. 29, 1994.

*Logothetis & Pence, John R. Doll* and *Julie C. Ford,* for appellants.

*Vorys, Sater, Seymour & Pease* and *Andrew C. Smith,* for appellee.

GREY, Judge.

This is an appeal from a judgment of the Common Pleas Court of Pike County. The union, Oil, Chemical & Atomic Workers International Union, Local Union No. 3–689, sued Martin Marietta on behalf of its members, seeking interpretation of a contract between its members and the company. The union requested a temporary restraining order and a preliminary injunction. The parties reached a partial agreement on the temporary restraining order, and the court denied the preliminary injunction. Martin Marietta then filed a motion requesting summary judgment on the remaining issue. The court granted the motion. We affirm.

Martin Marietta has a contract with the United States Department of Energy to operate a uranium enrichment plant near Piketon, Ohio. The union represents the employees at the plant. There are approximately one thousand employees at the facility.

In May 1991, the contract between the company and the union expired, and on June 11, 1991, the union members went out on strike. On June 25, 1991, the company sent a letter to the striking employees telling them that, under COBRA, their health insurance coverage could remain in force for up to eighteen months provided they paid the premiums. The next day, the company sent a letter to the striking employees offering to pay the insurance premiums during the strike if the employees agreed to repay the advance through payroll deductions after the strike ended. The letter required that each employee who wished to retain the coverage sign the agreement and return it to the company. Two hundred and forty-three employees signed. The agreement did not say how much would be

withheld from each paycheck or over what period of time the withholding would occur.

A substantial number of striking employees did not sign the agreement and did not have health care coverage. On September 4, 1991, the company offered a catastrophic-illness plan with a $5,000 deductible, *i.e.*, the employee was responsible for the first $5,000 in event of illness or injury. This plan was free to the employee, but it did not cover those who were participating in another plan. Several employees who had signed the prior agreement changed to this plan when it was offered.

In April 1992, the employees returned to work. In July 1992, the company announced it would begin making payroll deductions to recoup its costs for the health care insurance provided during the strike. The union objected to the company's original plan on the grounds that it would work a hardship on the union members. After negotiations the company told the employees they could choose from one of three payback options.

The first option was a lump-sum plan which required the employee to pay the entire amount in one lump sum. The second was a payroll deduction plan, whereby the company would withhold a set amount from the employee's paycheck over a period of six, twelve, or twenty-four months. Under the third option the company would withhold the amount from the employee's cost-of-living allowance, which is paid quarterly. The quarterly deductions would be made over a two-year period. None of the plans contained carrying charges or interest, and each employee could select the most preferable option. If no option was selected, the company would take payroll deductions out of each paycheck for a period of twelve months.

The deductions were to begin on August 31, 1992. The union told the company that the payback would still cause undue hardship for some of its members and the company reset the beginning payback date for October 5, 1992. On October 13, 1992 the union filed a class action suit, requesting relief prohibiting Martin Marietta from withholding funds for the cost of the insurance. In the alternative, the union asked the court to establish a fair repayment schedule for its members. Various matters which are not relevant to this appeal ensued and were resolved, *e.g.*, a motion for a temporary restraining order, a question of jurisdiction under ERISA, a claim of failure to state a claim upon which relief could be granted, and the union's request for a preliminary injunction which was denied.

On July 14, 1993, the company filed a motion requesting summary judgment on the remaining issue, *i.e.*, restructuring the payback terms, which had not been provided in the original contract. On September 15, 1993, the court filed its judgment entry, granting the motion. The union timely filed a notice of appeal and assigns the following errors.

FIRST ASSIGNMENT OF ERROR

"The trial court erred in finding that the repayment schedules unilaterally established by the defendant were not unreasonable or unlawful."

■ When reviewing a grant of a motion for summary judgment, we review the judgment independently and without deference to the trial court's determination. *Midwest Specialties, Inc. v. Firestone Co.* (1988), 42 Ohio App.3d 6, 536 N.E.2d 411. Summary judgment is appropriate when there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made. The party against whom the motion is made is entitled to have the evidence construed most strongly in its favor. *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 146, 524 N.E.2d 881, 883–884. Cf. *State ex rel. Coulverson v. Ohio Adult Parole Auth.* (1991), 62 Ohio St.3d 12, 14, 577 N.E.2d 352, 353–354.

■ The burden of showing that no genuine issue exists as to any material fact falls upon the party requesting summary judgment. *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798, 801, but a motion for summary judgment forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095, paragraph three of syllabus.

■ In its first assignment of error, the union says the court abdicated its duty to supply the missing contractual terms.

In granting Martin Marietta's motion for summary judgment, the court incorporated a prior decision which stated:

"What discretion does MMES have with respect to establishing a repayment schedule? And what is the role of the Court is this dispute?

"It is this Court's opinion that the discretion of MMES is not unlimited. On the other hand, this Court should neither substitute its judgment for that of MMES management, nor inject itself in any way into the collective bargaining process between the Union and MMES. But the Court should inquire whether the actions of the parties are unlawful, arbitrary or unduly and unnecessarily oppressive.

"The repayment plan proposed by MMES offers employees the option of extending payments over a 24 month period for premiums advanced during the 10 month strike. The Court has found nothing to suggest that this plan is unlawful; nor can the Court say that the plan is arbitrary. Moreover, the COBRA plan required by federal law is more oppressive to a striking employee,

since it requires the employee to pay the total monthly premium each month while the employee is not working."

This question is a matter of black letter contract law. A contract must be definite in its terms to be enforceable, and that includes the duration of a contract. Where the duration or time for performance is not spelled out, a reasonable time will be inferred.

Appellant misapprehends the function of the court in a contract case where the duration or term is indefinite. Appellant argues that if the term is indefinite, the court must review the contract and set reasonable terms. The rule of law is quite different. Where the term is indefinite, "the law implies that performance is to take place within a reasonable time, and *that the parties so intended and agreed.*" (Emphasis added.) *Stewart v. Herron* (1907), 77 Ohio St. 130, 147, 82 N.E. 956, 959.

The trial court found Martin Marietta's plan with its various options to be reasonable. It was intended and agreed that the insurance premiums would be withheld from the employee's compensation for a reasonable period of time after they returned to work.

Sanson, a representative of the class, testified that the original repayment plan would consume approximately forty percent of her weekly take-home pay. Krekeler, another representative of the class, would get no take-home pay under the original repayment plan. The record shows the original repayment plan was scrapped in favor of a more liberal plan, with the various options allowing for repayment up to two years. Appellant does not argue in this court, nor did it argue in the trial court, that these options were not within the implied reasonable time presumed to have been agreed upon by the parties.

When reviewing the grant of a motion for summary judgment we review the judgment independently and owe no deference to the trial court. Here, the union did not seek to establish that the repayment schedule was unreasonable, or not within the contemplation of the parties at the time the contracts were made, but actually sought to have the trial court establish a schedule based on hardship. We note that in some cases the repayments would work a hardship, but the union members were out on strike for months and any repayment plan or option, no matter how reasonable, would be hard for some members.

We do not believe the decision of the trial court was in error in upholding the options as being impliedly within the contemplation and agreement of the parties at the time the agreement to pay the premiums was made.

Appellant's first assignment of error is not well taken and is overruled.

## SECOND ASSIGNMENT OF ERROR

"The trial court erred in holding that the Defendant's unilateral withholding of sums from its employees' paychecks without authorization for the specific amounts withheld does not violate Ohio Revised Code Section 4113.15."

■■■ In its second assignment of error, the union says Martin Marietta's attempt to collect the repayment violates R.C. 4113.15. First, it argues that the deductions are unlawful because they are not for fringe benefits. Next, and not altogether clear, it appears to argue that the deductions are unlawful because the employees did not agree to a loan for the purposes of maintaining their health coverage. Martin Marietta suggests this is a classic case of "no good deed goes unpunished" and, whether viewed as fringe benefits or an advancement for fringe benefits, i.e., a loan, the withholding does not violate R.C. 4113.15.

R.C. 4113.15 requires employers to disburse their employees' wages, less certain deductions, at regular intervals. R.C. 4113.15(D) contains the following definitions:

"(1) 'Wage' means the net amount of money payable to an employee, including any guaranteed pay or reimbursement for expenses, less any federal, state, or local taxes withheld; any deductions made pursuant to a written agreement for the purpose of providing the employee with any fringe benefits; and any employee authorized deduction.

"(2) 'Fringe benefits' includes but is not limited to health, welfare, or retirement benefits, whether paid for entirely by the employer or on the basis of a joint employer-employee contribution, or vacation, separation, or holiday pay.

"(3) 'Employee authorized deduction' includes but is not limited to deductions for the purpose of: (a) purchase of United States savings bonds or corporate stocks or bonds, (b) a charitable contribution, (c) credit union savings or other regular savings program, or (d) repayment of a loan or other obligation."

The record shows the funds were advanced to pay for health care benefits. Health care benefits are clearly an allowable deduction under the statute. The Union argues that, once the money was advanced to pay for health care coverage, that advancement changed its character into a loan. It next suggests the loan is not a loan because, at the time the contract was entered into, there was no agreement as to either a repayment schedule or to specific amounts.

We find nothing ambiguous in R.C. 4113.15(D)(3)(d). The record shows that Martin Marietta sent letters to its striking employees telling them they could retain their medical coverage during the strike. The letter stated the monthly costs. The next day Martin Marietta sent a second letter, telling the employees it would advance the premiums and "Upon your return to work, payroll deductions for advanced premiums will be made until the premiums are recovered in full." The record shows that employees signed the agreement to take advantage

of the offer and that they could have terminated the agreement by notifying the personnel office. Whether viewed as a loan or as a fringe benefit, the agreement is not unlawful under R.C. 4113.15. The union's second assignment of error is not well taken and is overruled.

## THIRD ASSIGNMENT OF ERROR

"The trial court erred in granting Defendant's motion for summary judgment without permitting Plaintiffs to obtain full discovery on matters relevant to Plaintiffs' claims."

In its final assignment of error, the union says discovery was not complete because it had not ascertained whether the money was actually advanced for the benefit of the employees and, if it was advanced, whether the advancements were correctly computed.

The union says that, in some instances, its members requested medical coverage for three months but the company continued to provide the coverage throughout the strike. In other instances, it suggests the members were overcharged for the coverage.

A motion for summary judgment forces the nonmoving party to produce some evidence on any issue for which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd., supra.* This burden cannot be met by mere allegation. *Jackson v. Alert Fire & Safety Equip., Inc.* (1991), 58 Ohio St.3d 48, 567 N.E.2d 1027, citing *King v. K.R. Wilson Co.* (1983), 8 Ohio St.3d 9, 8 OBR 79, 455 N.E.2d 1282.

There are no affidavits alleging that Martin Marietta refused to honor the wishes of striking employees when they asked that coverage be terminated. There are no affidavits alleging that the original offering did not say how much the premiums would be per month. There are no affidavits alleging that the union members did not know how many months they participated in the plan while on strike. There are no affidavits alleging that when Martin Marietta told the strikers about the $5,000 catastrophic-illness coverage it was denied or refused to anyone who chose it. There are no affidavits alleging that when Martin Marietta told the individual members their total charges the charges were incorrectly computed. In short, there were no affidavits establishing any genuine issue of fact or law.

The union says that Martin Marietta failed to provide discovery regarding the amount it paid out in benefits during the strike, but the amount paid out by Martin Marietta is irrelevant. Martin Marietta is a self-insurer, but even at that, appellant misses the whole point of insurance. The union argues that the benefits paid out were less because there were fewer employees participating, but

that would almost always be the case where the pool of insureds is smaller. The premium agreed to at the beginning of the strike remained constant. The risk involved in providing coverage as agreed to at the beginning of the strike remained constant. Whether Martin Marietta paid out less or more, indeed whether any insurer makes money or loses money, is irrelevant to obligations incurred under an insurance contract.

Appellant does make a good point in arguing that if the monies advanced during the strike were passed on to the Department of Energy as costs and paid by the Department of Energy, then any funds recovered from the employees for those same advances are a double recovery. We presume that the contract auditors with Department of Energy keep a close eye on the spending of federal money and will take the trial court's decision into account in assessing the question of double payments. The department is not a party to this action or subject to the jurisdiction of this court. However, because of the large sum of taxpayer money involved, we will direct that the clerk of courts send a copy of this entry to the auditors' office of the Department of Energy at the Piketon plant.

The union's third assignment of error is not well taken and is overruled. Based on the foregoing, the judgment of the trial court is affirmed.

*Judgment affirmed.*

STEPHENSON and PETER B. ABELE, JJ., concur.